UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MAIN STREET BASEBALL, LLC and CLARK MINKER,

Plaintiffs,

-v- 3:15-CV-380

BINGHAMTON METS BASEBALL CLUB, INC. and BEACON SPORTS CAPITAL PARTNERS, LLC,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
| --- | --- |
| TODD & WELD LLP<br>Attorneys for Plaintiffs<br>1 Federal Street<br>27th Floor<br>Boston, MA 02110 | TYLER E. CHAPMAN, ESQ.<br>MAX D. STERN, ESQ.<br>HOWARD M. COOPER, ESQ. |
| COUGHLIN & GERHART, LLP<br>Attorneys for Plaintiffs<br>P.O. Box 2039<br>Binghamton, NY 13902 | OLIVER N. BLAISE, III, ESQ. |
| BOND, SCHOENECK AND KING, PLLC<br>Attorneys for Defendants<br>One Lincoln Center<br>Syracuse, NY 13202 | JONATHAN B. FELLOWS, ESQ.<br>BRENDAN M. SHEEHAN, ESQ. |

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiffs Main Street Baseball, LLC ("Main Street Baseball") and Clark Minker ("Minker") bring this action against defendants Binghamton Mets Baseball Club, Inc. ("Binghamton Mets Baseball Club") and Beacon Sports Capital Partners, LLC ("Beacon Sports") asserting a claim for breach of contract seeking specific performance (Count I) and injunctive relief (Count II).

Main Street Baseball and Minker filed their complaint on March 30, 2015. They filed an amended complaint and motion for a temporary restraining order and preliminary injunction, by order to show cause, pursuant to Federal Rule of Civil Procedure 65 ("Rule __") on April 2, 2015. Plaintiffs seek to enjoin defendants from discussing, negotiating, or agreeing with any other party concerning the sale of the Binghamton Mets Club, Inc. ("BMets") baseball team. Defendants opposed and plaintiffs replied.

A temporary restraining order was issued by the undersigned on April 2, 2015, at 2:00 p.m. in Utica, New York. The order temporarily restrained Binghamton Mets Baseball Club and Beacon Sports, their agents, servants, employees, and any person acting in concert with them from discussing, negotiating, or agreeing with any other party concerning the sale of the BMets baseball team.

Oral argument on the motion for a preliminary injunction was held on April 15, 2015 in Utica, New York. The parties were advised that decision would be reserved with a written decision to follow. On the same day, it was found that good cause existed to extend the temporary restraining order an additional fourteen days from the initial date of expiration. It was determined that the full time allowable under Rule 65(b)(2), twenty-eight days, was

necessary to adequately review the merits of the case and would not have a significant impact on the sale of the BMets baseball team if Binghamton Mets Baseball Club and Beacon Sports are eventually allowed to proceed with that course of action. Accordingly, the temporary restraining order was extended until April 30, 2015.

Main Street Baseball and Minker's motion for a preliminary injunction is currently pending and ripe for consideration.

## II. BACKGROUND

Main Street Baseball is a Florida limited liability company. David Heller ("Heller") is Main Street Baseball's principal and president. Heller manages and co-owns several minor league teams including the Wilmington Blue Rocks, a Single-A team that plays in Wilmington, Delaware. Minker is an investor and co-owns the Wilmington Blue Rocks with Heller. Heller and Minker sought to upgrade their team in Wilmington from a Single-A to a Double-A team; they aimed to purchase a Double-A team and move it to Wilmington, while selling the Wilmington Blue Rocks to a buyer who would relocate that team.

Binghamton Mets Baseball Club owns the BMets. The BMets play in the twelve-team Eastern League of Minor League Baseball and are the Double-A affiliate of the New York Mets. Michael Urda ("Urda") is president of the BMets. Beacon Sports is an investment banking firm for the professional sports industry; they brokered the BMets transaction that is at issue here. Richard Billings ("Billings") is principal of Beacon Sports.

In May 2014, Heller and Minker began discussions with Billings regarding their desire to purchase the BMets, and signed a confidentiality agreement to obtain relevant information regarding the team. Heller and Minker were introduced to Urda in August 2014, and by December 2014, they had reached an agreement with Urda and Billings regarding the sale of

the BMets. As is customary in the industry, a Letter of Intent ("LOI") was to be drafted by attorneys to memorialize the terms. The LOI was executed on January 5, 2015. The nine-page LOI contained, among other terms, a sixty-day "no shopping" period during which defendants could not negotiate with other buyers. The LOI provided for the negotiation of, and ultimate execution, of an Asset Purchase Agreement ("APA").

Urda requested Heller and Minker put $100,000 into escrow within two days of executing the LOI.[1] While Heller and Minker were prepared to do so, plaintiffs claim it took Billings more than two weeks to finalize the escrow agreement because Urda repeatedly changed who the agent would be. Plaintiffs eventually put the money into escrow on January 23, 2015. In the meantime, plaintiffs' attorney drafted the APA.

In early February 2015, Heller and Urda exchanged drafts of the APA at Urda's suggestion to save on legal fees. On February 14, Urda advised that his attorney would review the APA on February 18. In the meantime, Urda made changes to the APA which plaintiffs accepted. On February 25, fifty-one days into the sixty-day no shopping period, Urda forwarded his lawyer's comments. According to plaintiffs, Urda made many new demands but remained ready to execute the APA. Plaintiffs contend defendants' proposed changes altered the material terms of the LOI, in direct contravention of the LOI. One such change related to the parties' indemnification obligations, which plaintiffs claim the LOI provided for without reference to a deductible or cap. Defendants contend that a deductible and cap were to be negotiated before the APA was finalized, but that plaintiffs refused to

[1] This $100,000 was to be the First Security Deposit. A Second and Third Security Deposit would eventually be due. The LOI memorialized a purchase price of $8.5 million for the team.

negotiate these terms. On February 28, Urda advised Heller that he would be traveling out-of-state starting March 19 and that he wanted the APA to be finalized before that date.

Between February 28 and March 11, 2015, emails were exchanged between the parties and their attorneys. According to Main Street Baseball and Minker, Binghamton Mets Baseball Club and Beacon Sports refused to finalize the APA consistent with the LOI, as required by the LOI. Despite this, Urda never indicated the deal was off. On March 11, defendants' attorney emailed plaintiffs' attorney and advised that defendants remain interested in selling but that the sixty-day no shopping period had expired (as of March 5) and they would simultaneously consider other offers. On March 13, defendants' attorney emailed plaintiffs' attorney and advised that defendants were ceasing negotiations with plaintiffs. Heller and Minker allege that on March 19, they heard that the BMets had already entered into a LOI with another buyer.

Plaintiffs argue the LOI was a binding contract for the purchase of the team. Binghamton Mets Baseball Club and Beacon Sports contend the LOI is not binding, and expired at the end of the sixty-day period. The LOI states it is intended to pursue the proposed acquisition of the team. While the LOI was executed on January 5, 2015, plaintiffs did not send a first draft of the APA to defendants until February 4.[2] Defendants contend they were ready and willing to execute the February 25 draft which included changes by their attorney. Instead, plaintiffs objected to that draft, would not agree to the proposed changes, including a deductible or cap on indemnification, and failed to provide proposed changes back to defendants.

---

[2] It is noted that both parties were intimately involved in the drafting of the LOI/

Pursuant to the LOI, usual customary representations and warranties were still to be negotiated in the APA. Defendants claim these terms included indemnities, while plaintiffs contend the LOI fully provided for all indemnities. In addition to Heller and Minker's alleged unwillingness to negotiate defendants' proposed changes, Heller and Minker themselves made new demands for the APA, such as adding an arbitration provision and the award of prevailing party attorneys' fees which defendants did not agree to, and which were not a part of the LOI.

Binghamton Mets Baseball Club and Beacon Sports contend that the parties could not agree on these and many other issues, so they advised Main Street Baseball and Minker on March 11, 2015 that the exclusivity period had ended. Also on March 11, Urda spoke with Joseph McEacharn, president of the Eastern League of Professional Baseball Clubs, Inc. who was aware of the LOI between the parties. Urda advised McEacharn that the exclusivity period with plaintiffs had ended and they were unable to reach an agreement. McEacharn advised that he knew of another interested buyer who would contact Urda shortly. That buyer did so, and defendants executed a LOI with the new potential buyer on March 13.

## III. DISCUSSION

By their motion, Main Street Baseball and Minker seek to preliminarily enjoin Binghamton Mets Baseball Club and Beacon Sports from discussing, negotiating, or agreeing with any other party concerning the sale of the BMets baseball team for six months. They contend the parties could take expedited discovery during the next six months, followed by a hearing on the merits of plaintiffs' claims. Defendants urge that the temporary restraining order in place should be vacated and the preliminary injunction denied, but if

granted, plaintiffs should be required to post a bond for $8.5 million, the purchase price of the team.

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." Patton v. Dole, 806 F.2d 24, 28 (2d Cir. 1986). "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction."[3] Benihana, Inc. v. Benihana of Tokyo, LLC, No. 14-841, __ F.3d ___, 2015 WL 1903587, at *6 (2d Cir. Apr. 28, 2015) (quoting Salinger v. Colting, 607 F.3d 68, 79–80 (2d Cir. 2010)). Even if a plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may still be granted if the plaintiff shows "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." Metro. Taxicab Bd. of Trade v. City of New York, 615 F.3d 152, 156 (2d Cir. 2010) (internal quotations omitted). This alternative "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010).

[3] The "public interest" prong simply means that if injunctive relief is granted, a court should ensure that the injunctive provisions of the order do not harm the public interest. SEC. v. Citigroup Global Mkts. Inc., 673 F.3d 158, 163 n.1 (2d Cir. 2012).

"The purpose of issuing a preliminary injunction is to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the . . . merits." Candelaria v. Baker, No. 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar. 10, 2006) (internal quotations omitted). Preliminary injunctive relief "'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506, 510 (2d Cir. 2005) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." Id. (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992)). Finally, "[a] decision to grant or deny a preliminary injunction is committed to the discretion of the district court." Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 78 (2d Cir. 1994).

**A. Likelihood of Success or Serious Question as to the Merits**

Main Street Baseball and Minker argue they are likely to succeed on the merits of their breach of contract claim, or at a minimum, there is a serious question going to the merits and a balance of hardships tips in their favor. Binghamton Mets Baseball Club and Beacon Sports challenge plaintiffs' likelihood of success on the merits on two grounds. First, defendants argue the LOI was not a binding contract. Second, defendants argue that even if the LOI was binding in some way, they did not breach any contractual obligations.

To establish a breach of contract claim under New York law, a plaintiff must plausibly allege "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011). The parties agree as to these

familiar elements, but dispute the existence of a binding contract. Accordingly, the breach of contract claim first depends on whether the LOI was a binding contract.

**1. The Legally Binding Nature of the LOI**

By its plain terms, the LOI contemplates the preparation and execution of additional documentation, namely, an APA. The LOI therefore belongs to a class of agreements known as "preliminary agreements which . . . provide for the execution of more formal agreements." Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 547 (2d Cir. 1998). "[W]here the parties contemplate further negotiations and the execution of a formal instrument," a preliminary agreement ordinarily "does not create a binding contract." Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005). "In some circumstances, however, preliminary agreements can create binding obligations." Id.; see also Shann v. Dunk, 84 F.3d 73, 77 (2d Cir. 1996) ("[I]f a preliminary agreement clearly manifests such intention, it can create binding obligations."). The questions then, are: (1) whether the LOI created binding obligations; and (2) if so, whether those obligations included a commitment by defendants to sell the team to plaintiffs, or merely an obligation to negotiate in good faith. At the preliminary injunction stage, plaintiffs carry the burden to demonstrate that they are likely to succeed on the merits of their breach of contract claim, or that there is a serious question going to the merits and a balance of hardships tips in their favor.

The Second Circuit classifies binding preliminary commitments into one of two categories. Adjustrite, 145 F.3d at 548.[4] Agreements within the first category are Type I

---

[4] Defendants urge that New York law disfavors this two type classification system. A Southern District of New York judge recently expounded upon this apparent conflict:

> In a footnote addressing whether a settlement agreement was binding, the

(continued...)

preliminary agreements—"fully binding preliminary agreement[s], which [are] created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." Id.; see also Shann, 84 F.3d at 77 ("Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities."). Agreements of this type render the parties "fully bound to carry out the terms of the agreement even if the formal instrument is never executed." Adjustrite, 145 F.3d at 548.

Agreements within the second category are Type II preliminary agreements—"binding preliminary commitment[s]" that are "binding only to a certain degree" because "the parties agree on certain major terms, but leave other terms open for further negotiation." Id. (internal quotations omitted); see also Shann, 84 F.3d at 77 ("Type II is where the parties recognize

---

[4](...continued)

> New York Court of Appeals noted that federal courts had divided preliminary agreements into two types, and explained: "While we do not disagree with the reasoning in federal cases, we do not find the rigid classifications into 'Types' useful." IDT Corp. v. Tyco Grp., 13 N.Y.3d 209, 215 n.2 (2009). The Court of Appeals found that the case before it could be resolved by asking a more straightforward question: "whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance." Id.
>
> In a case handed down after IDT, however, the Second Circuit drew on the "Type I"/ "Type II" framework. SSP Capital Partners, LLP v. Mandala, LLC, 402 F. App'x 572, 573 (2d Cir. 2010) [summary order]. Courts in this District have also continued to use the framework. See, e.g., Sawabeh Info. Servs. Co. v. Brody, 11 CIV. 4164 SAS, 2014 WL 46479, at *10 (S.D.N.Y. Jan. 6, 2014); Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 861 F. Supp. 2d 344, 356 (S.D.N.Y. 2012). Accordingly, absent guidance from the Second Circuit or the New York Court of Appeals to the contrary, this Court will continue to rely on the framework.

Similarly, courts in this District have also continued to use the two type classification system following the 2009 New York Court of Appeals case. See, e.g., Juanes v. Lyzwinski, 875 F. Supp. 2d 155, 161 (N.D.N.Y. 2012) (Baxter, M.J.). Thus, absent guidance from the Second Circuit or the New York Court of Appeals to the contrary, the two type classification system will be used here.

the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open."). Type II agreements "do[ ] not commit the parties to their ultimate contractual objective." Adjustrite, 145 F.3d at 548 (internal quotations omitted). Rather, they bind the parties "to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." Id. (internal quotations omitted). If the parties "fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." Id.

The LOI bound defendants to sell and plaintiffs to purchase the BMets if it constituted a Type I agreement, but not if it constituted a Type II agreement or was, in the alternative, not binding in any respect. The LOI merely bound the parties to negotiate in good faith if it constituted a Type II agreement. Plaintiffs argue the LOI is a Type I agreement, binding the parties to the sale, or at a minimum, a Type II agreement which defendants breached. Defendants contend the LOI is not a Type I nor Type II agreement, and even if interpreted as a Type II agreement, plaintiffs have not plausibly alleged a breach of contract. The Second Circuit has identified four factors to analyze when considering whether an agreement is a Type I preliminary agreement, and five factors to analyze when considering whether an agreement is a Type II preliminary agreement.

When considering whether an agreement is a Type I preliminary agreement, the following four factors should be analyzed: (1) "whether there is an expressed reservation of the right not to be bound in the absence of a writing"; (2) "whether there has been partial performance of the contract"; (3) "whether all of the terms of the alleged contract have been agreed upon"; and (4) "whether the agreement at issue is the type of contract that is usually

committed to writing." Brown, 420 F.3d at 154. When considering whether an agreement is a Type II preliminary agreement, the following five factors should be analyzed: (1) "whether the intent to be bound is revealed by the language of the agreement"; (2) "the context of the negotiations"; (3) "the existence of open terms"; (4) "partial performance"; and (5) "the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." Id. at 157.

The Second Circuit has noted that not all of the factors from the two sets are relevant or helpful in every context. See Vacold LLC v. Cerami, 545 F.3d 114, 124–25 (2d Cir. 2008). Further, as some of the factors duplicate or overlap with each other, they can and will be addressed in the same discussion. Id. Finally, when applying these factors, courts must be "mindful of the need to balance two competing policy concerns. On the one hand, courts must avoid trapping parties in surprise contractual obligations that they never intended." Gas Natural, Inc. v. Iberdrola, S.A., 33 F. Supp. 3d 373, 379 (S.D.N.Y. 2014) (internal quotations omitted). Simultaneously, "courts must enforce and preserve agreements that were intended to be binding, despite a need for further documentation or further negotiation." Id. (internal quotations omitted). Finally, the Second Circuit has advised that while "these factors help us identify categories of facts that are often useful in resolving disputes of this sort . . . they do not provide us with a talismanic scorecard. The ultimate issue, as always, 'is the intent of the parties: whether the parties intended to be bound, and if so, to what extent.'" Vacold, 545 F.3d at 125 (quoting Adjustrite, 145 F.3d at 548–49).

**a. Language of the Agreement**

The first and most important factor is whether the language of the agreement "discloses an intention by the parties to be bound to the ultimate objective." Brown, 420 F.3d

at 154. The relevant inquiry is whether the agreement expressly states that the parties will not be bound in the absence of a further, definitive written instrument. Id. There does not appear to be such a reservation here. The LOI is nine pages long and clearly sets forth the parameters of the transaction. It begins: "[t]his letter outlines the terms of our mutual and fully binding intention (the "Letter of Intent") to pursue the proposed acquisition of the Binghamton Mets baseball club." Am. Compl, Ex. A, 2, ECF No. 6–1, at 2 ("LOI") (emphasis added).[5] It explicitly states that it "shall constitute a legally binding commitment of the Parties to execute and deliver the Asset Purchase Agreement . . . and fulfill such other obligations and satisfy such other conditions related thereto to facilitate Purchaser receiving all necessary Baseball Approvals to close the contemplated transaction herein." Id. The LOI further notes that after executing the APA, "Seller would sell, convey, transfer, assign, and deliver to Purchaser, and Purchaser would purchase, acquire and assume, in exchange for the Purchase Price set forth in Section 3, all of Seller's assets, properties and rights." Id. ¶ 1.

The LOI is "not a proposal, a draft, an expression of desires, or a memorandum of understanding." Vacold, 545 F.3d at 125 (citing Brown, 420 F.3d at 154 (two-page "memorandum of understanding" held not to be a Type I preliminary agreement); Adjustrite, 145 F.3d at 549 (two-page "proposal" that stated "desires" held non-binding); Winston v. Mediafare Entm't Corp., 777 F.2d 78, 81 (2d Cir. 1985) ("proposed agreement" held non-binding)). Like the binding agreement in Vacold, the LOI here did not speak in "decidedly non-committal" language "suggesting, at most, a promise to work together." Id. (quoting Brown, 420 F.3d at 154). Instead, the LOI "specified, in considerable detail, the performance

[5] The cited page numbers for the LOI refer to the electronically generated numbers appearing at the top right-hand corner of each page of the document.

that it required of each party." Id. Where, as here, an agreement uses language that is committal, and specifies each party's performance in detail, it is indicative of a Type I agreement. See id.

Moreover, the LOI specified in detail what would become of the deal if the parties were unable to execute an APA by the end of the sixty-day period. Also in support of finding the LOI constitutes a Type I agreement is the LOI's drafting history, which courts are both permitted and required to consider. Id. at 127 (citing Winston, 777 F.2d at 80–81 (in "determin[ing] whether the parties intended to be bound," we consider "'correspondence [and] other preliminary or partially complete writings'" (quoting Restatement (Second) of Contracts § 27 cmt. c))). According to plaintiffs, the parties negotiated the terms of the sale for fourth months (August to December 2014), and after shaking hands on December 8, 2014, they spent the next two and a half weeks exchanging multiple drafts of the LOI. According to plaintiffs, Urda stressed that he wanted the LOI to be binding, to which Heller and Minker agreed.

At the same time, however, other language in the LOI supports the conclusion that the LOI is at most a Type II agreement. Although "not necessarily controlling," labels "such as ‘letter of intent' or 'commitment letter'" may "be helpful indicators of the parties' intentions." Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 497 (S.D.N.Y. 1987). Defendants point to the opening sentence of the LOI, which as described above, states that "[t]his letter outlines the terms of our mutual and fully binding intention . . . to pursue the proposed acquisition." LOI, at 2 (emphasis added). Similarly, in Brown, 420 F.3d at 154, the subject memorandum of understanding purported to "outline the terms under which [the parties] will work together to develop, build, market, and manage a new real estate venture."

Id. (emphasis in original). The Second Circuit found that language to be "decidedly non-committal" and concluded that the agreement was not a Type I agreement. Id.

Further, the assertion that the LOI "shall constitute a legally binding commitment" is prefaced by the phrase "[n]otwithstanding anything to the contrary contained in this Letter of Intent." LOI, at 1. The phrase "[n]otwithstanding" or similar, could suggest it overrides any binding obligations the LOI otherwise purports to impose. See Gas Natural, 33 F. Supp. 3d at 379. Moreover, the "legally binding commitment" described above applies "except as set forth in Sections 5, 6, 8, 9, 10, 12 and 13 [of the LOI]." LOI, at 2. Notably, Section 12 clarifies that "the Parties agree to use their reasonable best efforts to negotiate, execute and deliver, prior to the expiration of the No-Shopping Period [Section 9], a mutually agreeable Asset Purchase Agreement . . . ." Id. at 8, § 12. The express language of the LOI sets an end to the parties' negotiation of the final agreement, the APA. Thus it could be concluded that any obligations to sell and purchase the team terminated at the expiration of the sixty-day no shopping period. Finally, the LOI expressly contemplated the future drafting and execution of the APA, in which "[t]he obligations of the Parties shall be spelled out in greater specificity." LOI, at 2. These provisions suggest an intent by the parties not to be bound by the "ultimate objective."

These provisions and the competing interpretations lead to the conclusion that there are, at a minimum, serious questions as to whether the language of the agreement weighs more strongly in favor of plaintiffs or defendants.

**b. Partial Performance**

The second factor is satisfied either where both parties undertake performance, or where one party begins performance with the knowledge or approval of the other party. See

Brown, 420 F.3d at 148. At defendants' request, plaintiffs made their first payment—the $100,000 First Security Deposit into escrow—toward purchase of the team. While defendants point out that the LOI contemplated at least one, and possibly two additional security deposits, this does not negate plaintiffs' partial performance. This favor weighs in favor of a finding that the LOI was possibly a Type I agreement, or at a minimum, a Type II agreement.

**c. Open Terms**

The existence of open terms "is always a factor tending against the conclusion that the parties have reached a binding agreement," Tribune, 670 F. Supp. at 499, and there is a "'strong presumption against finding binding obligation[s]'" in an agreement that "'include[s] open terms . . . and expressly anticipate[s] future preparation and execution of contract documents,'" Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989) (quoting Tribune, 670 F. Supp. at 499). "At the same time, the parties' intent is ultimately controlling: if the parties intended to be bound despite the presence of open terms, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations, provided that the agreement is not so fragmentary as to be incapable of sustaining binding legal obligation." Vacold, 545 F.3d at 128 (internal quotations and citations omitted). As the Second Circuit further elaborated in Vacold:

> If a preliminary agreement contains "no issues outstanding that were perceived by the parties as requiring negotiation, their agreement should be seen as a[ ] Type I binding obligation," Shann, 84 F.3d at 82, notwithstanding that the parties may intend to memorialize their understanding in more formal documents, Adjustrite, 145 F.3d at 548. But if, in contrast, the parties enter into a preliminary agreement perceiving that open issues remain to be worked out and intending simply to bind themselves to

> good-faith efforts at further negotiation, then the preliminary agreement, if an agreement at all, is a type II obligation. Id.

545 F.3d at 128.

It appears the parties fully agreed to all the material terms of the transaction in the lengthy LOI. They agreed to the total purchase price of $8.5 million and the timing of payment of the purchase price including the payment of multiple security deposits. They agreed to maintenance of contracts and business relationships, assignment of the stadium lease, and retention of employees. Plaintiffs contend the parties also agreed to assumption of liabilities, retained obligations and indemnification, and risk of loss, and the only terms that needed to be "fleshed out" in a formal agreement were "representations and warranties customary for a transaction of this nature." LOI, at 2.

In contrast, Binghamton Mets Baseball Club and Beacon Sports point out that the LOI expressly contemplated further negotiations by the parties and the LOI refutes Main Street Baseball and Minker's contention that only minor issues remained to be added to the APA. See LOI, at 8 § 12. Section 12 provides:

> The Parties agree to use their reasonable best efforts to negotiate, execute and deliver, prior to the expiration of the No-Shopping Period, a mutually agreeable [APA] containing provisions consistent herewith and such other terms and provisions as are normally included in asset purchase agreements . . . including, without limitation, usual and customary representations and warranties, disclosures, and indemnities.

Specifically, defendants argue the issue of indemnification was left open, and that while Section 4 provides for indemnification, it does not indicate any cap or deductible.[6] Instead,

---

[6] Defendants have submitted evidence that it is not customary in the industry to have unlimited indemnity.

Section 12 provides for the later negotiation of indemnities. Defendants also point out the new terms which plaintiffs themselves attempted to negotiate during the sixty-day period, including a guarantee of no loss during the 2015 season, an arbitration and prevailing party fees provision, and responsibility for the collection of accounts receivable. Defendants argue that these provisions, not in the LOI, establish that plaintiffs also believed there to be open terms left to negotiate following the execution of the LOI.

These provisions and the competing interpretations lead to a finding that there is, at a minimum, a serious question as to the merits of plaintiffs' claims.

**d. Type of Contract to be Committed to Writing**

"New York courts have recognized that the 'complexity and duration of [an] alleged agreement' is particularly significant in determining whether it must be reduced to formal writing in order to be fully enforceable." Brown, 420 F.3d at 155. The parties do not dispute that this $8.5 million sale is the type of complex agreement which would ordinarily be committed to a formal contract. However, plaintiffs contend the nine-page LOI is sufficient to constitute the required writing, while defendants argue the APA is the formal writing envisioned by the LOI.

Again, these competing interpretations raise at least serious questions as to the binding nature of the LOI.

**e. Context of Negotiations** (only a Type II factor)

"An agreement is likely to be a type II preliminary agreement, and not a fully binding type I preliminary agreement, when it is 'subject to numerous contingencies that ha[ve] the potential to dramatically affect planning, execution, and management' of the ultimate contractual objective." Vacold, 545 F.3d at 127 (quoting Brown, 420 F.3d at 158).

This factor likely turns on whether the terms of indemnification were settled in the LOI as Main Street Baseball and Minker argue, or left open to be negotiated as Binghamton Mets Baseball Club and Beacon Sports assert. If, as plaintiffs suggest, the terms of indemnification were settled in the LOI, this factor would favor the conclusion that the LOI was of the Type I variety—a definite agreement to buy and sell the team, subject to the parties' ability to merely negotiate representations and warranties customary in this type of transaction, and their ability to execute an APA within sixty-days. The parties foresaw that their transaction had the potential to be affected by a future contingency, namely, the parties' failure to reach an agreement or execute an APA within sixty-days, and the LOI provided for what would happen in that event. On the other hand, if the LOI left open to negotiate the various terms cited by defendants, including those additional issues raised by plaintiffs during negotiations, then the LOI was subject to numerous contingencies that had the potential to dramatically affect planning, execution, and management of the transaction.

Like all of the above factors, plaintiffs have at least established that there is a serious question going to the merits.

**f. Balance of Hardships**

It is difficult to determine with certainty at this early juncture whether plaintiffs are likely to succeed on the merits of their breach of contract claim. At a minimum, plaintiffs have demonstrated "a serious question going to the merits to make them a fair ground for trial." Metro. Taxicab Bd. of Trade, 615 F.3d at 156. To sustain their burden and ascertain a preliminary injunction under this standard, the balance of hardships must also tip decidedly in plaintiffs' favor. This alternative "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than

not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." Citigroup Global Mkts., 598 F.3d at 35.

In balancing the hardships, plaintiffs assert they will be harmed if an injunction is not granted because defendants will sell the team to another buyer and that sale cannot be undone. They contend there will be no harm to defendants if their attempt to sell the team to another buyer is delayed because defendants could be compensated with money damages for such delay. Further, the team will be sold to plaintiffs or another buyer so defendants will obtain the $8.5 million plus from a sale either way. Defendants argue they are currently harmed by the temporary restraining order because they cannot communicate with the new buyer with whom they have already negotiated a LOI, and would be further harmed if a preliminary injunction is entered.

While plaintiffs will suffer a hardship in the absence of a preliminary injunction, defendants will also suffer a hardship if a preliminary injunction is entered. On these facts, the balance of hardships tips ever so slightly in plaintiffs' favor.

**2. Remaining Breach of Contract Elements**

Plaintiffs must demonstrate a likelihood of success on the merits of their claim, or at least a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in their favor. While the existence of a binding contract has been discussed in great detail, plaintiffs must also sustain their burden as to the remaining breach of contract elements: "(2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props, 631 F.3d at 52.

As to performance of plaintiffs' obligations under the LOI, plaintiffs have established that they paid the First Security Deposit of $100,000 and were ready and willing to make the subsequent required payments.

As to breach, Main Street Baseball and Minker assert Binghamton Mets Baseball Club and Beacon Sports breached their good faith duty to negotiate open issues by trying to insert new terms in the APA inconsistent with the LOI and at a late date. Plaintiffs also assert that defendants breached the LOI by shopping the team around before the sixty-day exclusivity period ended. Defendants argue that even if the LOI is a Type II agreement, they did not breach their duty to negotiate in good faith. They contend their duty expired when the sixty-day no shopping period elapsed, and up until that time, plaintiffs were the ones who delayed and did not negotiate in good faith—waiting thirty-eight days after the LOI was executed to send the first draft of the APA. Finally, they argue there is no evidence they violated the no shopping period.

Although on the current record there is no conclusive proof that defendants violated the no shopping period, the quick timing in which defendants signed a LOI with a new buyer (at most two days after informing plaintiffs the deal was off), suggests the possibility that defendants violated the exclusivity period by engaging in discussions or negotiations with another buyer. Further, there are serious questions going to the issue of good faith negotiations.

Finally, plaintiffs have demonstrated they can establish damages sustained as a result of defendants' alleged breach.

For all of the foregoing reasons, plaintiffs have met their burden of demonstrating there is a sufficiently serious question as to the merits of their breach of contract claim and

the balance of hardships tips in their favor. They have therefore satisfied the second element for a preliminary injunction.

**B. Irreparable Harm**

A showing that irreparable injury will be suffered before a decision on the merits may be reached is the most significant condition a plaintiff must demonstrate to obtain a preliminary injunction. Citibank, N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985). To demonstrate irreparable harm, a plaintiff must show an "'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" Forest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 153 (2d Cir. 1999) (quoting Rodriguez v. DeBuono, 162 F.3d 56, 61 (2d Cir. 1998)); see also Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotations omitted). "Also falling within the ambit of 'irreparable harm' are situations where 'there is a threatened imminent loss that will be very difficult to quantity at trial.'" Syler v. Woodruff, 610 F. Supp. 2d 256, 262 (S.D.N.Y. 2009) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995)). The Second Circuit also recognizes that the loss of potential business opportunities, such as relationships with customers and business partners, may constitute irreparable harm. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004).

Main Street Baseball and Minker contend they will suffer irreparable harm if a preliminary injunction is not issued because the team is unique property and a monetary award would not be adequate compensation. Specifically, the opportunity to own the BMets

is unique and irreplaceable because it meets all of plaintiffs' requirements for a team to purchase: it is the only Double-A team that is for sale, that is portable, that is affiliated with a New York or Philadelphia Major League Baseball franchise, that is affordable to plaintiffs, and whose relocation would be likely approved by various baseball authorities. Further, money damages would be difficult to quantify at trial. They argue the harm is not just in their inability to purchase the BMets, but also in a possible lost deal that they have negotiated for the Wilmington Blue Rocks. Finally, plaintiffs cite the six months they worked to negotiate the instant transaction, and assert that the damage to Heller and Minker from losing the value of those efforts is incalculable.

Binghamton Mets Baseball Club and Beacon Sports contend Main Street Baseball and Minker cannot demonstrate irreparable harm because money damages are an adequate remedy should they prevail, and the purchase of the BMets is only unique in the context of their multi-team relocation plan. However, plaintiffs' relocation plan was never part of the instant negotiations, and was expressly excluded from the proposed transaction by Section 17 of the LOI. Thus, plaintiffs' reliance argument is misplaced.

The time-sensitive nature of this action is recognized, given that the 2015 Minor League Baseball season is already underway and the goal was to execute the APA by March 5, 2015, with a closing date no later than September 30, 2015. Further, this action is time-sensitive as defendants are in the process of negotiations to sell the BMets to another buyer, and have already signed a LOI with that buyer. Although not of relevance to the instant transaction, plaintiffs are also in the process of negotiating, or have already completed negotiations to sell the Wilmington Blue Rocks to the Texas Rangers. These facts, coupled with plaintiffs' assertions about the uniqueness of the team and upon finding that money

damages would not be an adequate remedy if in fact the LOI is found to be a Type I binding agreement, plaintiffs stand to lose the opportunity to buy the BMets if defendants are not preliminary enjoined from selling the team to another buyer. Therefore, plaintiffs have satisfied the second element for a preliminary injunction.

**C. Balance of Hardships**

When confronted with a motion for a preliminary injunction, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). Plaintiffs must establish that the "balance of hardships tips in their favor regardless of the likelihood of success." Salinger, 607 F.3d at 79–80. For the same reasons as explained above, the balance of equities tips in favor of plaintiffs. Plaintiffs stand to lose their opportunity to purchase the BMets if an injunction is denied. By contrast, defendants do not stand to suffer the same sort of harm. While they will be preliminarily enjoined from selling the BMets to another buyer, they will be permitted to negotiate with other buyers during the pendency of this action. Further, the injunction is not a permanent one and it is highly probable that the defendants will have one or more interested buyers when the preliminary injunction is lifted.

Accordingly, the balance of hardships tips in plaintiffs' favor. Plaintiffs have thus satisfied the third element for a preliminary injunction.

**D. Public Interest**

The public interest factor does not appear to tip in favor of either party. "[C]ourts of equity may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved." Brown & Williamson Tobacco Corp.

v. Engman, 527 F.2d 1115, 1121 (2d Cir. 1975). Neither party has called to the court's attention any public interest that would be served or disserved by granting an injunction. Nor do any such interests appear to be at stake. Granting a preliminary injunction would allow this lawsuit to proceed and permit a decision on the merits while preventing defendants from selling the team to another buyer during the pendency of the action. Denying a preliminary injunction would allow defendants to proceed with the sale of the team to another buyer. Either way, it does not appear that the world will be deprived of Minor League Baseball, nor would other, more serious deprivations occur. Instead, the only question is whom defendants will eventually sell the team to. That is a question of purely private interest. To the extent it is implicated at all, "the public interest is served by the enforcement of the parties' lawful agreement." See Benihana, Inc., 2015 WL 1903587, at *8.

## IV. CONCLUSION

Plaintiffs have carried their burden to establish that there are sufficiently serious questions going to the merits of their breach of contract claim; they are likely to suffer irreparable harm in the absence of a preliminary injunction restraining defendants from selling the BMets to another buyer; the balance of equities tips in their favor; and an injunction would not be contrary to the public interest. For these reasons, a preliminary injunction will be entered enjoining defendants from selling the BMets to another buyer. Defendants are free to continue negotiations and discussions with any other buyers. As plaintiffs have already placed $100,000 in escrow with defendants, a bond will not be required pursuant to Rule 65(c).

Therefore, it is

ORDERED that

Defendants Binghamton Mets Baseball Club, Inc. and Beacon Sports Capital Partners, LLC are PRELIMINARILY ENJOINED from selling the Binghamton Mets Club, Inc. baseball team until further order of this court.

IT IS SO ORDERED.

United States District Judge

Dated: April 30, 2015
Utica, New York.